# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### Waco Division

|  |  |
|---|---|
| KURT H. DORR, | ) |
|  | ) |
| Plaintiff, | ) Case No. 6:13-cv-00197 _____ |
|  | ) |
| v. | ) |
|  | ) |
| BAYLOR ALUMNI ASSOCIATION, a Texas | ) |
| Non-Profit Corporation, BAYLOR | ) |
| UNIVERSITY, a Texas Non-Profit Corporation, | ) |
| ELIZABETH E. COKER, and COLLIN J. COX, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |
|  | ) |

## VERIFIED COMPLAINT

Plaintiff Kurt H. Dorr ("Dorr") files this Complaint against the Baylor Alumni Association ("BAA"), Baylor University ("Baylor"), Elizabeth E. Coker ("Coker"), and Collin J. Cox ("Cox") and in support thereof states and alleges as follows:

## Nature of the Case

1.     This lawsuit is brought to block an *ultra vires* transaction between the BAA and Baylor, pursuant to which the BAA would turn over to Baylor – in contravention of the BAA's historic purposes and without any meaningful consideration – all of the BAA's assets. These assets include, perhaps most importantly, the BAA's perpetual license to occupy and use the Hughes-Dillard Alumni Center – a building that the BAA imminently intends to hand over to Baylor and which Baylor imminently intends to destroy. In particular, Plaintiff seeks a temporary restraining order and preliminary injunction to prevent the destruction of the Hughes-Dillard Alumni Center, which is scheduled to recommence July 3, 2013, until such time as the

1

BAA complies with its Constitution and Bylaws and Texas law by allowing for a vote of the Board of Directors and, if recommended by the Board, a vote of the membership.

2.      The purported transaction between the BAA and Baylor should be voided and declared a nullity because the BAA has failed to follow the mandatory corporate governance processes enshrined in Texas law and the BAA's Constitution and Bylaws, which requires both the approval of the BAA's Board of Directors and a vote of the BAA's members in order to approve transactions of the sort at issue in this case.  Neither has occurred here.  In addition to the flawed approval procedures, the purported transaction is also substantively infirm because certain of the BAA's directors and officers violated their fiduciary duties by purporting to agree that the BAA would dissolve and give up all of its assets in contravention of its historic purposes and without receiving anything meaningful in return.

3.      It is unfortunate that it has become necessary for Plaintiff to seek emergency relief in this case.  However, as recently as June 26, 2013, Baylor intended to enter the Hughes Dillard building's premises and begin the process of removing fixtures in the building, such as the engravings of names of loyal Baylor families, memorials, monuments, and the like.  As of the present time, Baylor has deferred any further such action until July 3, 2013, at which time it intends to proceed with the demolition of the Hughes-Dillard building.  It is evident then that the Baylor construction crew with its wrecking ball is simply standing by and waiting to begin work at a moment's notice, but by no later than July 3, 2013.  Unless Plaintiff is granted the injunctive relief that he seeks herein, there will no longer exist a Hughes-Dillard building with respect to which the membership of the BAA could to cast a vote.  Hence, it is necessary for Plaintiff to seek such extraordinary relief from this Honorable Court.

4.      In this lawsuit, Plaintiff does not seek monetary damages from any Defendant. Rather, Plaintiff seeks injunctive relief and a temporary restraining order to preserve possession of the Hughes-Dillard building and the BAA's other assets pending a vote of BAA's members, and a declaration that the transaction between Baylor and the BAA is invalid under Texas law and the BAA's governing documents.

## Parties

5.      Plaintiff Kurt H. Dorr is a resident of Naperville, Illinois.  He is a voting Lifetime Member of the BAA.

6.      Defendant Baylor Alumni Association is a Texas non-profit corporation with its principal place of business in McLennan County, Texas.

7.      Defendant Baylor University is a Texas non-profit corporation with its principal place of business in McLennan County, Texas.

8.      Defendant Elizabeth E. Coker ("Coker") is a resident of Texas.  She is the immediate past President of the BAA Board of Directors.

9.      Defendant Collin J. Cox ("Cox") is a resident of Texas.  He is the President of the BAA Board of Directors.

## Jurisdiction and Venue

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a).  Plaintiff is a citizen of Illinois and each of the Defendants is a citizen of Texas.  The amount in controversy – *i.e.*, the property at stake in this case – exceeds $75,000 in value, exclusive of interests and costs.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because several Defendants reside in this district and all Defendants are residents of Texas.  Venue is also proper

in this district pursuant to 28 U.S.C. § 1391(b)(3) both because a substantial part of the events and omissions giving rise to this case occurred in this district and because a substantial part of the property that is the subject of this case is situated in this district.

**Facts**

**A.      The Baylor Alumni Association's Relationship and Binding Contracts with Baylor**

12.      Founded in 1859, the BAA serves as the general alumni association of Baylor University.  The BAA's work is dedicated to serving Baylor and its alumni.  The BAA has long been a trusted partner with Baylor.

13.      The BAA is an independently incorporated 501(c)(3) not-for-profit corporation, is financially self-supporting, and legally independent of Baylor University.

14.      The BAA's independence is a fundamental and historic purpose of the organization, and one great source of its value to the Baylor family.  Baylor University is governed by a largely self-perpetuating Board of Regents.  The board meets in secret and binds its members to confidentiality.  Regents are structurally and actually unaccountable to Baylor students, faculty, alumni and staff.  In the context of this unusual governance structure, wise leaders of Baylor created an independent alumni association to serve as a "voice" of Baylor alumni and ensured its survival by entering into perpetual, binding agreements with the BAA.  Key agreements between Baylor and the BAA include the 1993 License Agreement and the 1994 and 1995 Building Agreements.

15.      *The 1993 License Agreement*:  In September 1993, Baylor and the BAA entered into a legally binding License Agreement to clarify the relationship between the BAA and Baylor.  A true and correct copy of the License Agreement is attached as Exhibit A.  Under the License Agreement:

a.      BAA is granted the sole and exclusive right to use the marks "Baylor University Alumni Association" and "Baylor Alumni Association" for alumni services and related products.  BAA is also granted the sole and exclusive right to use the mark *Baylor Line* for audio, video, printed or electronic publications.

b.      The license is "perpetual and fully paid-up."

c.      BAA is to "serve as the general alumni organization of Baylor University, including coordination of alumni activities," carry out all of the purposes of its chartering documents, publish an alumni magazine, and organize and sponsor activities for Baylor Homecoming.

d.      The license agreement also states that the BAA is "an independent 'voice' of alumni of Baylor University, and the positions taken by [BAA] (editorial or otherwise) which may be contrary to the administration of the University or its Board of Regents shall ***not*** be alleged by [Baylor] to constitute insufficient quality and shall not be grounds for [Baylor]'s termination of this License Agreement."  (Emphasis added.)

16.     *The Building Agreements for Hughes-Dillard Alumni Center Building*:  The BAA donated the money to build the Hughes-Dillard Alumni Center building ("Hughes-Dillard"), the BAA's current home.  In May 1994, Baylor and the BAA entered into an agreement titled, "The Official Recognition and License Agreement between Baylor University and the Baylor University Alumni Association for an On-Campus Alumni Center."  In April 1995, the BAA and Baylor entered into the "Agreement Regarding Building of Baylor University Alumni Association."  These two agreements will be referred to collectively as the "Building

Agreements."  True and correct copies of the Building Agreements are attached as Exhibit B. The key terms of the Building Agreements are:

    a.    Baylor grants to the BAA "an exclusive license to occupy for its exclusive use a building on the Waco campus of Baylor" for the purposes of providing alumni services.

    b.    In particular, Baylor grants the BAA exclusive right to occupy and use Hughes-Dillard and the driveways, parking lots, and land on which it sits.

    c.    BAA's right to occupy and use Hughes-Dillard is for "an indefinite term," terminable only under specified conditions.

    d.    Specifically, Baylor may terminate the BAA's right to use Hughes-Dillard only if all of the following occurs:

        (1)    Baylor needs the land on which Hughes-Dillard is located for its purposes;

        (2)    No other land is reasonably available to Baylor for the purpose for which the land is needed; and

        (3)    Baylor provides the BAA with "another building on the Baylor campus the size, condition, quality of construction, and location of which is approximately the same as the size, condition, quality of construction, and location of the Hughes-Dillard Alumni Center."

17.    The License Agreement and Building Agreements were carefully drafted to protect the BAA's historic purpose of maintaining its independence and to ensure its survival, even in the face of threats from Baylor's administrators or Regents.  The wisdom and value to

Baylor of an independent alumni association was perhaps best described by former Baylor

President Robert Sloan, who wrote in the *Baylor Line* magazine:

> Down through the years, one of the single greatest functions of the alumni association has been supporting the university in times of stress and conflict. It is important for alumni to have a voice and to be able to speak out, whether it is to be a friendly critic or to be an enthusiastic cheerleader. Both of those are legitimate functions. The alumni association's independence is the foundation of its effectiveness. If you are not independent, then your praise does not sound credible and your critique can be shut down. But when you are independent, you can be both of those – with strength and credibility.

**B.      Some Recent Baylor Administrators and Regents Seek to Control the BAA**

18.      However, starting not long after those words were written, certain individuals

within the Baylor's administration and Board of Regents began a concerted attempt to fold the

independent BAA into Baylor's internal alumni communications department, with the intent to

control the BAA and its voice.

19.      In 2009, Baylor's Regents presented the BAA with a proposed agreement entitled

"A Proposal to Combine Resources and Enhance Alumni Relations" (the "2009 Proposal"). The

2009 Proposal was signed by Baylor's Interim President and Board of Regents chair and was

addressed to the BAA's Board of Directors.

20.      The gist of the 2009 Proposal was that the BAA forfeit its historic purpose of

maintaining independence from Baylor and come under control of the Baylor administration.

Specifically, the 2009 Proposal requested the BAA to dissolve its charter and for its total scope

of operations and staff to become part of a "new Baylor Alumni Association," which would be a

division within Baylor (namely, University Development).

21.      Baylor's Regents first presented the 2009 Proposal to then-BAA president David

Lacy and urged Mr. Lacy to sign the agreement on behalf of the BAA. Mr. Lacy informed

Baylor officials that he lacked authority to sign such an agreement because a plan to dissolve the BAA required approval from both the BAA Board and membership.

22.     Mr. Lacy presented the 2009 Proposal to the BAA Board.  The BAA Board was virtually unanimous in the view that the proposed agreement was unacceptable.  The BAA Board established a committee to evaluate the 2009 Proposal.

23.     Baylor withdrew the 2009 Proposal before the BAA took formal action on it.

**C.     June 1, 2012:  Coker and Cox Become President, President-Elect**

24.     On June 1, 2012, Elizabeth Coker took office as president of the BAA.  That same day, Collin Cox assumed the position of president-elect.  Coker is a lawyer and a democratically elected state district judge in Livingston, Texas.  Collin Cox, a former president of the Baylor student body, is an attorney in Houston.

25.     About that same time, drawings released by Baylor of its proposed Baylor Stadium depicted the area where Hughes-Dillard now sits as being an empty green field.  Those drawings also showed the current location of the Hughes-Dillard parking lot being replaced with stone pavers.

26.     In or about June or July 2012, Baylor University sought tax credits from the City of Waco TIF zone for the demolition of Hughes-Dillard.

**D.     Baylor's Vague Reasons for Demolishing Hughes-Dillard are a Sham and, in Any Event, are Insufficient under the Building Agreements**

27.     Under the Building Agreements, Baylor can take possession of Hughes-Dillard only if (a) Baylor needs the land for a specific purpose; (b) no other land on campus is reasonably available for that purpose; and (c) Baylor provides the BAA with a comparable building in a comparable place on campus.

28.     Baylor has provided vague, unsubstantiated reasons for wanting to demolish Hughes-Dillard.  Baylor's own drawings make plain that there is no actual need to demolish Hughes-Dillard, and certainly no need that cannot be otherwise reasonably addressed without demolishing the building.

29.     Baylor apparently asserts that it requires the Hughes-Dillard site in connection with the completion of its construction of its new on-campus football stadium.  Baylor's website demonstrates that the Hughes-Dillard building and grounds are to be used for the creation of a grass field bisected by a single sidewalk and the Hughes-Dillard parking lot apparently is to be replaced with an open, paved or stone surface.

30.     Hughes-Dillard is not in the way of any bridge that is part of the stadium design or any walkway or building associated with Baylor stadium.  The BAA could easily grant an easement or even surrender part of its large parking area to accommodate Baylor's stated reason for needing the land on which Hughes-Dillard sits.  Baylor's drawings show the footbridge coming to ground on the grounds of the Law School, far away from Hughes-Dillard.  There is plenty of other land and grounds that are reasonably available to Baylor for its stated purposes, and demolition of the Hughes-Dillard building is not necessary.  Accordingly, any attempt by Baylor to terminate the BAA's license and rights with respect to Hughes-Dillard is in direct violation of the Building Agreements.

31.     Further, on June 19, 2013, at a Baylor Network luncheon in Fort Worth, Texas, Kenneth Starr, Baylor's President, told the audience that Baylor elected to demolish Hughes-Dillard because the architect on the stadium project said that if Baylor wants an "ideal situation," then the Hughes-Dillard building should be demolished.  President Starr announced that he and

Baylor had accepted the architect's recommendation that Hughes-Dillard should be demolished for an "ideal situation."

**E.      The May 31, 2013 Plan of Dissolution**

32.      As of July 20, 2012, Coker was in dialogue with Baylor officials related to Baylor's plans to demolish Hughes-Dillard.  Cox was aware of those discussions and, on information and belief, participated in them.

33.      None of Coker, Cox, or Jeff Kilgore (the BAA's then-Executive Director) ever presented to the BAA Board of Directors or membership for vote any proposal to vacate Hughes-Dillard.

34.      On information and belief, at no time prior to May 31, 2013, did Coker, Cox or Mr. Kilgore make the BAA Board or membership aware of any formal notice from Baylor demanding or requesting that the BAA vacate Hughes-Dillard.

35.      On May 31, 2013, Baylor sent the BAA's counsel a letter purporting to unilaterally terminate, effective September 8, 2013, certain agreements between Baylor and the BAA including the License Agreement and the Building Agreements, in the event that the BAA did not agree to terminate those agreements by that date.  With this threat from Baylor in hand, on May 31, 2013, Coker, Cox and then-Executive Director of the BAA Jeff Kilgore, executed two related agreements that serve to grant Baylor the wholesale terminations sought in Baylor's May 31, 2013 letter:  a "Transition Agreement Between Baylor University and Baylor Alumni Association" and an "Agreement Between Baylor University and Baylor Alumni Association to Vacate Hughes Dillard Alumni Center."

36.     Together these three documents (the "May 31 Plan Documents") outline a coordinated plan to dissolve the BAA, surrender Hughes-Dillard, and dispose of all of the BAA's other assets ("May 31 Plan of Dissolution").

37.     *The Notice Unilateral of Termination*:  On May 31, 2013, Baylor presented the BAA's counsel with what Baylor claims to be a "notice of unilateral termination" of numerous current agreements between the BAA and Baylor, including the License Agreement and the Building Agreements ("Notice of Unilateral of Termination").  A true and correct copy of the Notice of Unilateral of Termination is attached as Exhibit C.  As stated above, Baylor's Notice of Unilateral Termination threatens the BAA with the termination of the License Agreement and the Building Agreements (among others), if the BAA does not agree to terminate those agreements by implementing the "Transition Agreement" described in the next paragraph.

38.     *The Transition Agreement:*  The BAA capitulated to Baylor's threat when, on May 31, 2013, Coker, Cox and Mr. Kilgore signed the "Transition Agreement Between Baylor University and Baylor Alumni Association" ("Transition Agreement").  The Transition agreement provides for the dissolution of the BAA and the distribution of all of its assets.  A true and correct copy of the Transition Agreement is attached as Exhibit D.  In particular, the Transition Agreement provides that the BAA "shall transfer its assets to B[aylor]" and another newly-created third party entity "and dissolve the BAA legal entity."  Further, "BAA operations shall be transferred into BU."  The Transition Agreement contains an express agreement to "terminate by mutual consent all executory agreements between B[aylor] and BAA," including the License Agreement and the Building Agreements.  *See* Exhibit D at 2.  The Transition Agreement also purports to give Baylor the unilateral right to terminate all agreements between Baylor and the BAA, provided the effective date is no earlier than September 8, 2013.  *See id.*

The Transition Agreement also contemplates that Hughes-Dillard would be vacated by the BAA in accordance with the terms of an agreement that is attached to the Transition Agreement. *See id*. at 2, 6. The Transition Agreement purports to become effective only if the BAA membership approves it. *See id*. at 8. However, the Transition Agreement has never been presented to, or voted on by, the BAA Board of Directors or its members.

39.     *The Agreement to Vacate*: As part of the transaction contemplated by the Transition Agreement, on May 31, 2013, Coker, Cox and Mr. Kilgore also signed a document entitled "Agreement Between Baylor University and Baylor Alumni Association to Vacate Hughes Dillard Alumni Center" ("Agreement to Vacate"), *i.e.*, the document attached to the Transition Agreement. A true and correct copy is attached as Exhibit E. The Agreement to Vacate begins with several "Recitals," including a recital that "Baylor and the Association are in negotiations to create a new relationship that would provide for a new corporation, the Baylor Line Corporation, and the Baylor Alumni Advisory Board internal to Baylor ('Transition Agreement')." The Transition Agreement is referenced in four of the five operative paragraphs of the Agreement to Vacate and, together with the Transition Agreement, represents a single, integrated transaction. The Agreement to Vacate purports to require the BAA to vacate its corporate headquarters – the Hughes-Dillard building – and its premises by July 3, 2013, so that the building may be demolished by Baylor. As recently as June 30, 2013, President Starr stated in an e-mail to Cox that Baylor desired to "move swiftly in removing the Hughes Dillard Alumni Center."

40.     In keeping with the Transition Agreement, the Notice of Unilateral of Termination is to become effective September 8, 2013 – the day after the BAA membership is scheduled to vote on the Transition Agreement.

41.     Thus, Baylor's express purpose in the Notice of Unilateral of Termination is to unilaterally terminate the License Agreement and Building Agreements in the event that the BAA membership declines to approve the Transition Agreement and to coerce the BAA into approving the Transition Agreement and the Agreement to Vacate.

42.     Under the terms of the License Agreement and Building Agreements, Baylor does not have a right to unilaterally terminate either agreement unless the BAA is in default.

43.     That Baylor does not currently have the right to unilaterally terminate the License Agreement or the Building Agreement is evidenced by the fact that the Transition Agreement, if approved, purports to grant such a right to Baylor.  However, absent compliance with the BAA's governing documents and Texas law (including the approval by the BAA's members), that right does not exist.

44.     The BAA is not in default under either the License Agreement or the Building Agreements and Baylor does not claim such a default.  The Notice of Unilateral Termination does not identify any act of default nor does it offer the BAA any opportunity to cure.  It provides no explanation for the legal basis upon which Baylor claims to terminate the License Agreement and the Building Agreements.

45.     The Notice of Unilateral Termination does not properly terminate the License Agreement or the Building Agreements and is without any legal effect.

46.     Prior to the execution of the Transition Agreement and the Agreement to Vacate, neither Cox nor Coker notified the BAA Board of Directors or sought the approval of the Board of Directors.

**F.     The May 31 Plan of Dissolution Requires Board and Membership Approval under Texas Law**

47.     The May 31 Plan of Dissolution – which was forced upon the BAA by Baylor in the May 31 Notice of Unilateral Termination, and described in the May 31 Transition Agreement and the May 31 Agreement to Vacate – is a "sale of all or substantially all of the assets" of the BAA pursuant to TEXAS BUSINESS ORGANIZATIONS CODE § 22.164(8).  The May 31 Plan of Dissolution is therefore a "fundamental action" of the BAA that requires that the BAA members have an opportunity to vote thereon.

48.     This action is brought by Dorr – a voting member of the BAA – to seek (among other things) enforcement of his right to vote on fundamental action under TEXAS BUSINESS ORGANIZATIONS CODE §§22.164(8) and (b)(1).

**G.     The May 31 Plan of Dissolution Requires Board Approval under the BAA Constitution and Bylaws**

49.     Article IV, Section 1 of the Constitution and Bylaws of the BAA ("BAA Bylaws") states that the "affairs of the Association shall be managed by its Board of Directors." A true and correct copy of the BAA Bylaws is attached as Exhibit F.

50.     Similarly, Article V, Section 4 of the BAA Bylaws provides that the President may sign, with the Secretary or any other proper officer of the Association authorized by the Board of Directors, any contract "which the Board of Directors has authorized to be executed."

51.     The BAA Board of Directors has not approved the Transition Agreement or the Agreement to Vacate.

52.     Although the BAA's Bylaws delegate to the BAA's Executive Committee certain powers of the Board of Director, Article VI, Section 1 of the BAA Bylaws specifically provides that the Executive Committee does not have the authority of the Board in reference to "adopting

a plan of merger or a plan of reorganization [or] authorizing the sale, lease, exchange or mortgage of all or substantially all of the property and assets of the Association."

53.     Because the Transition Agreement and the Agreement to Vacate contemplated by the Transition Agreement are clearly part of a plan to effect an outright dissolution of the BAA and a distribution of all or substantially all of the BAA's assets, the BAA Executive Committee lacks authority to execute either agreement.

**H.      The May 31 Plan of Dissolution's Impact on, and the Importance and Uniqueness of, the Hughes-Dillard Building**

54.     The Agreement to Vacate would have the effect of surrendering one of the most valuable assets possessed by the BAA without any meaningful consideration.  The Agreement to Vacate would require the BAA to vacate the Hughes-Dillard building by July 3, 2013, and purportedly would offer a short-term alternative location for the BAA until it dissolved as contemplated by the Transition Agreement.

55.     The Agreement to Vacate does not provide the BAA with any assurance that Baylor will honor the Building Agreements by relocating the BAA to a comparable building on campus.  To the contrary, the Notice of Unilateral Termination issued by Baylor expresses Baylor's intent not to honor the Building Agreements if the Transition Agreement is not approved by the BAA membership.  Thus, if the Transition Agreement contravenes Texas law or the BAA membership declines the Transition Agreement and elects to continue to exist, the BAA will already have surrendered possession of Hughes-Dillard and will have received nothing of substantial value in return.

56.     Thus, even if the President and President Elect had authority to sign the Agreement to Vacate (which they did not), nobody exercising reasonable judgment would have signed the Agreement to Vacate on behalf of the BAA.  Only someone attempting to orchestrate

a surrender of the BAA's assets and very existence would have agreed to these terms.  Instead of defending the BAA against Baylor's illegal Notice of Unilateral Termination, Coker and Cox simply capitulated in Baylor's requests to terminate the Building Agreements.  The Building Agreements are binding and enforceable and should be protected as valuable assets of the BAA.

57.     The exercise of reasonable judgment would at the very least require that the BAA Board of Directors, and then the membership, decide whether to surrender possession of perhaps the BAA's greatest tangible asset.  The BAA's, Coker's, and Cox's actions threaten to destroy and demolish the Hughes-Dillard Building and the BAA entity itself in contravention of Texas law, in violation of the BAA's governing documents, and without any vote by the BAA membership, including Plaintiff Dorr.  In this regard, irreparable injury to Dorr is being suffered or is threatened because of the actions of the BAA, Coker, and Cox with regard to the fundamental action contemplated by the Transition Agreement and the Agreement to Vacate the Hughes-Dillard building – which is being carried out even before the required BAA member vote.

58.     The Hughes-Dillard Alumni Center is a unique building that was constructed specifically to house and meet the needs of the BAA.  It has housed the BAA since 1978.

59.     As former Baylor President Robert Sloan stated in 1997:  "The alumni center thus serves an essential function in the campus community, for it is the place through which all the connections pass."

60.     The BAA raised funds specifically for the construction, and later the renovation and expansion, of Hughes-Dillard.

61.     In his June 30, 2013 e-mail to Cox, President Starr stated that Baylor "fully understand[s] the sadness that accompanies removal of the Hughes Dillard Alumni Center.  We

16

share in the sorrow that was eloquently expressed when we gathered at the recent reception last Saturday at Hughes Dillard, a sorrow which has been described in recent conversations my colleagues and I have had with various alumni."

62.     President Starr's e-mail also noted that "[r]ecognized and celebrated on the walls and on the grounds of the Hughes Dillard Alumni Center are many, many individuals – in some instances, generations of families – who have contributed to the mission and vision of Baylor University over the duration of its history."

63.     Although President Starr stated that Baylor would attempt to preserve "to the best of our ability," "the many and varied recognitions that have occupied the Hughes Dillard facility," it will of course be impossible to do so entirely if the building is demolished as Baylor plans to do beginning on July 3, 2013.

## Causes of Action

### Count I Against BAA, Coker, and Cox:
### Violations of Texas Business Organizations Code § 22.164 and of the BAA's Bylaws

64.     Plaintiff Dorr incorporates and re-alleges paragraphs 1-63 above.

65.     Texas Business Organizations Code, Chapter 22, governs Non-Profit Corporations.  Texas Business Organizations Code § 22.164 provides that a vote of the members of the non-profit corporation is required to approve "fundamental action."  "Fundamental action" includes "a sale of all or substantially all of the assets of a corporation under Subchapter F."  *Id.* § 22.164(8).  "The phrase 'sale of all or substantially all of the assets' means the sale, lease, exchange, *or other disposition,* other than a pledge, mortgage, deed of trust, or trust indenture unless otherwise provided by the certificate of formation, of all or substantially all of the property and assets of a domestic corporation that *is not made in the usual and regular course*

17

*of the corporation's activities* without regard to whether the disposition is made with the goodwill of the corporation's activities." *Id.* § 22.252(h) (emphasis added).

66.     The Transition Agreement and the Agreement to Vacate are fundamental actions that provide for the disposition of "all or substantially all of the assets" of the BAA and as such they require a recommendation of the BAA Board of Directors and a vote of the general membership of the BAA. *Id.* § 22.252(d).  The actions of the Defendants BAA, Coker, and Cox to approve and implement the Transition Agreement and the Agreement to Vacate in the absence of a BAA Board of Directors recommendation and vote by the full membership of the BAA are in direct violation of Texas Business Organizations Code §§ 22.164(8) and (b)(1).

67.     The BAA, Coker, and Cox's breaches of Texas Business Organizations Code §§ 22.164(8) and (b)(1) have caused and threaten to continue to cause irreparable harm to Dorr by effectively disenfranchising him by refusing to give him his right to vote on the fundamental actions embodied in the Transition Agreement and the Agreement to Vacate – agreements which Defendants BAA, Coker, and Cox have already begun to implement.

68.     Separately, because the Transition Agreement and the Agreement to Vacate contemplated by the Transition Agreement are clearly part of a plan to effect an outright dissolution of the BAA and a distribution of all or substantially all of the BAA's assets, the BAA Executive Committee lacks authority to execute either agreement.  The lack of approval by the BAA's Board of Directors means that the execution and implementation of the Transition Agreement and the Agreement to Vacate by Defendants BAA, Coker, and Cox was in violation of the BAA's Constitution and Bylaws.

**Count II Against Coker and Cox:**
**Violations of Texas Business Organizations Code §§ 22.221 and 22.235**

69.     Plaintiff Dorr incorporates and re-alleges paragraphs 1-68 above.

70.     Texas Business Organizations Code § 22.221 sets forth the general standards applicable to the conduct of directors of Texas non-profit corporations.  That section states:  "A director shall discharge the director's duties, including duties as a committee member, in good faith, with ordinary care, and in a manner the director reasonably believes to be in the best interest of the corporation."  Tex. Bus. Org. Code § 22.221(a).  Section 22.221 also provides for a director's liability – including to "a member" of the corporation – if the director fails to act in good faith, with ordinary care, and in a manner the director reasonably believes to be in the best interest of the corporation.  *Id.* § 22.221(b).

71.     Texas Business Organizations Code § 22.235 sets forth identical standards for the conduct of an officer of a corporation.

72.     The BAA's Constitution and Bylaws state that the BAA's purpose is:

> to provide the support of benevolent, charitable, and educational undertakings by extending financial and other aid to Baylor University and to students thereof, by generally encouraging sentiments favorable to education and by promoting union of and good fellowship among former students and friends of Baylor University; to coordinate all alumni activities; to serve the general alumni organization of Baylor University; and to maintain the administrative agency and executive personnel needed to provide for a continuity of alumni activity, interest and financial support of Baylor University.

73.     As recognized by both Baylor and the BAA, another critically important historic purpose of the BAA is that it remain an "independent voice" of alumni of Baylor University. *See, e.g.*, ¶ 15.d., *supra*; Exhibit A hereto.

74.     The Transition Agreement and the Agreement to Vacate make it impossible for the BAA to engage in its fundamental purposes.  Those agreements would eliminate the Hughes-Dillard Alumni Center which, as stated above, "serves an essential function in the campus community, for it is the place through which all the connections pass."  The agreements would also destroy the BAA's historic purpose of maintaining its independence from Baylor.  Indeed,

they would literally destroy the BAA itself, after giving away all of its assets.  Thus, the

Transition Agreement and the Agreement to Vacate are directly contrary to the BAA's best

interests and fundamental purposes, and it is impossible for a director or officer of the BAA to

execute or implement those agreements while acting in good faith or with ordinary care.

75.     By entering into and implementing the Transition Agreement and the Agreement

to Vacate, Coker and Cox have each violated their duties as both directors and officers of the

BAA, in violation of Texas Business Organizations Code §§ 22.221 and 22.235.

76.     Coker and Cox's violations have and will continue to cause Dorr irreparable

harm.  Among other things, if the BAA is dissolved and its assets given away, Dorr would lose

the support and services he currently receives from the BAA, including but not limited to his use

and enjoyment of the Hughes-Dillard Alumni Center when Dorr visits Baylor.

**Count III Against Baylor:**
**Breach of Contract**

77.     Plaintiff Dorr incorporates and re-alleges paragraphs 1-76 above.

78.     Baylor and the BAA have entered into the License Agreement and the Building

Agreements.  Those agreements are valid and binding on the parties.

79.     As a member of the BAA and an alumnus of Baylor, Plaintiff Dorr is a third-party

beneficiary to the License Agreement and the Building Agreements.

80.     Baylor's attempt in its Notice of Unilateral of Termination to terminate the

License Agreement and the Building Agreements constitutes a breach or anticipatory breach of

those agreements.

81.     That breach by Baylor has caused harm to Plaintiff Dorr by interfering with the

BAA's ability to serve its members and Baylor's alumni, including Dorr.

82.     Dorr would be irreparably harmed if Baylor were permitted to breach the License

20

Agreement and the Building Agreements by unlawfully terminating those agreements. Among other things, Dorr would lose the support and services he currently receives from the BAA, including but not limited to his use and enjoyment of the Hughes-Dillard Alumni Center when Dorr visits Baylor.

### Prayer for Relief

WHEREFORE, Plaintiff Kurt H. Dorr requests that judgment be entered in his favor and against Defendants Baylor Alumni Association, Baylor University, Elizabeth E. Coker, and Collin J. Cox, and that Dorr be granted relief as follows:

1.    A temporary restraining order and preliminary and permanent injunctions decreeing that Baylor and the BAA, by and through its director(s), officer(s), agent(s), servant(s), and/or employee(s), including but not limited to Coker and Cox, and any of their respective agent(s), servant(s), employee(s), successor(s), assign(s) shall:

A.    Treat the Transition Agreement and the Agreement to Vacate as currently unauthorized transactions and refrain from implementing those agreements in any manner unless and until the Transition Agreement and the Agreement to Vacate are (1) submitted to the BAA Board of Directors for recommendation in accordance with the BAA's Constitution and Bylaws and Texas Business Organizations Code § 22.164, (2) duly approved by a vote of the BAA membership in accordance with the Texas Business Organizations Code § 22.164, and (3) determined by the Court to be in the best interests of the BAA; and

B.    Maintain the BAA's possession of the Hughes-Dillard Alumni Center building on the campus of Baylor University. This includes the BAA's

maintaining (and refraining from the removal of) both staff of the BAA and personal/business property items of the BAA in the Hughes-Dillard premises, the BAA's maintaining the physical premises of the Hughes-Dillard building, and Baylor's refraining from any action that would interfere with the BAA's possession or use of the Hughes-Dillard Alumni Center.

2.      Preliminary and permanent injunctions decreeing that Coker, Cox and the BAA, by and through its director(s), officer(s), agent(s), servant(s), and/or employee(s), including but not limited to Coker and Cox, and any of their respective agent(s), servant(s), employee(s), successor(s), assign(s) shall refrain from engaging in any further activity in violation of Texas Business Organizations Code § 22.164 and the Constitution and Bylaws of the Baylor Alumni Association, amended and restated as of October 22, 2010, including but not limited to any further unauthorized, illegal, or improper action of the Executive Committee of the BAA.

3.      Preliminary and permanent injunctions decreeing that Coker and Cox shall refrain from engaging in any further activity in violation of Texas Business Organizations Code §§ 22.221 and 22.235.

4.      Preliminary and permanent injunctions decreeing that Baylor shall refrain from breaching the License Agreement and the Building Agreements.

5.      A declaration from this Court that:

A.      The BAA, by and through its officers and directors, including without limitation, Coker and Cox, acted without authority in agreeing to and implementing the Transition Agreement and the Agreement to Vacate;

B.      The Transition Agreement and the Agreement to Vacate are void and

unenforceable as a matter of law; and

C.      Baylor's Notice of Unilateral of Termination is without basis and is

without effect, and that the License Agreement and the Building

Agreements remain valid and in full legal force and effect.

6.      Dorr's costs of suit herein, including attorneys' fees.

7.      Such other and further relief to which Dorr may show himself justly entitled.


Respectfully Submitted,

/s/ Gerald W. Haddock_____
Gerald W. Haddock
  Texas Bar No. 08675000
gerald@haddockfirm.com
Arin K. Schall
  Texas Bar No. 24037440
arin@haddockfirm.com
THE HADDOCK FIRM, LLP
500 Main Street, Suite 1015
Fort Worth, Texas 76102
Telephone:  (817) 885-8390
Facsimile:  (817) 885-8391

John P. Mabry, Jr.
  Texas Bar No. 00794203
Mabry@MabryLewis.com
John L. Lewis
  Texas Bar No. 24009036
Lewis@MabryLewis.com
MABRY LEWIS LAW FIRM, L.L.P.
400 Austin Avenue, Suite 104
Waco, Texas 76701
Telephone:  (254) 752-7500
Facsimile:  (254) 752-7501

Adam P. Feinberg (*pro hac vice* forthcoming)
afeinberg@milchev.com
John C. Eustice (*pro hac vice* forthcoming)
jeustice@milchev.com
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, NW, Suite 900
Washington, D.C.  20005-5701
Telephone: (202) 626-5800
Facsimile: (202) 626-5801


Thomas A. Nesbitt
  Texas Bar No. 24007738
tnesbitt@dnaustin.com
Scott F. DeShazo
  Texas Bar No. 24011414
DESHAZO & NESBITT L.L.P.
809 West Ave.
Austin, Texas  78701
Telephone:  (512) 617-5562
Facsimile:  (512) 617-5563

**Attorneys for Plaintiff Kurt H. Dorr**

## **VERIFICATION**

THE STATE OF ILLINOIS                           §
                                                §
COUNTY OF DuPAGE                                 §

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this day personally appeared Kurt H. Dorr, known to me to be a credible person, and stated to me, under oath, that he has read the foregoing pleading, that he is aware of the facts set forth in Paragraphs *12* - *63* based on personal knowledge, or on information and belief where specifically stated, and that they are true and correct. Dorr has relied upon counsel with respect to those paragraphs containing legal argument.

Signature: _Kurt H. Dorr_

Date: _7-1-2013_

SWORN AND SUBSCRIBED BEFORE ME, this the _1st_ day of July, 2013.

**OFFICIAL SEAL
DENISE A MODICA
Notary Public - State of Illinois
My Commission Expires Nov 27, 2014**

_Denise A Modica_
Notary Public in and for
The State of Illinois