UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
Waco Division

| | | |
|---|---|---|
| KURT H. DORR | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 6:13-cv-00197-WSS |
| | § | |
| BAYLOR ALUMNI ASSOCIATION | § | |
| BAYLOR UNIVERSITY, | § | |
| ELIZABETH E. COKER, and | § | |
| COLLIN J. COX | § | |
| Defendants | § | |
| | § | |

**DEFENDANT BAYLOR UNIVERSITY'S MOTION TO DISMISS PLAINTIFF'S
VERIFIED COMPLAINT AND RESPONSE TO PLAINTIFF'S APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff filed a Verified Complaint and an Application for a Temporary Restraining Order and Preliminary Injunction ("Application") in an inappropriate attempt to interfere with contractual rights freely negotiated between two independent parties—both represented by Counsel. Plaintiff is not a party to any contract. This Court should not allow him to hinder the parties' relocation plan through injunctive relief that restricts Baylor's use of its own property which it needs for completion of its $250 million on-campus stadium project ("Stadium Project"). Defendant Baylor University ("Baylor") files this Motion to Dismiss Plaintiff's Verified Complaint ("Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) for lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted with its Response to Plaintiff's Application for a Temporary Restraining Order and Preliminary Injunction and would respectfully show the Court as follows:

# OVERVIEW

In 2011, Baylor began preparations to build a new football stadium ("Stadium") on its campus. Baylor hired Populous, a worldwide leader in sports stadium architecture, to develop a master plan for the Stadium. The Stadium will be located across the Brazos River from Baylor's main campus. It has an approximate cost of $250 million, towards which donors have given well over 50% of that amount. As a part of the master plan for the Stadium Project, Populous recommended that Baylor build a grand pathway and bridge to connect the Baylor campus to the Stadium. Populous and Baylor believe that this broad access to Campus for tens of thousands of fans is essential for the Stadium Project, both physically and aesthetically.[1] The Hughes-Dillard Alumni Center ("Hughes-Dillard") sits within the grand pathway.

Baylor unquestionably owns the Hughes-Dillard. Baylor gave the BAA a permissive-use license to Hughes-Dillard in the 1994 Recognition Agreement. Under the terms of that agreement, Baylor has the right to move the BAA to a comparable space on campus in the event Baylor reasonably needs Hughes-Dillard. Because of Baylor's $250 million Stadium Project, Baylor and the BAA agreed in the 2013 Agreement to Vacate, pursuant to the terms of the 1994 Recognition Agreement, to move the BAA from Hughes-Dillard to Robinson Tower. Baylor needs the land on which Hughes-Dillard sits for the grand pathway leading to the Stadium. Other land is not reasonably available for this purpose. Plaintiff wrongly seeks to interfere with Baylor's and the BAA's administration of the 1994 Recognition Agreement, thereby interfering with Baylor's needs for the reasonable use of its own real property by agreement with the BAA. Even if Baylor were in breach of the 1994 Recognition Agreement (which it is not), Plaintiff

---

[1] See Exhibit I, Declaration of Reagan Ramsower, at 4.

lacks standing to assert such a claim and pursue injunctive relief regarding Baylor's use of the property.

Plaintiff improperly attempts to conflate the Agreement to Vacate and a separate Transition Agreement, in which Baylor and the BAA preliminarily agreed to the future reorganization of the BAA. However, the Agreement to Vacate and the Transition Agreement are completely separate agreements. The Transition Agreement is not final and is subject to a BAA Member vote in September 2013. Because of the Stadium Project, Baylor and the BAA would have had to administer the 1994 Recognition Agreement by entering into the Agreement to Vacate regardless of whether there was a Transition Agreement. Baylor's need has no connection to the potential future reorganization of the BAA. The Transition Agreement itself makes clear that the Agreement to Vacate was "resolved through a separate agreement and process." Baylor and the BAA executed and implemented the Agreement to Vacate separately from the Transition Agreement.

Plaintiff is not entitled to enjoin Baylor or the BAA (or its directors/officers) because he has cited no basis for his causes of action and injunctive relief against the BAA, Baylor, or the individual defendants under the circumstances, particularly where the BAA has already performed the Agreement to Vacate as of June 28, 2013. The BAA Executive Committee had authority to administer the 1994 Recognition Agreement by entering into the Agreement to Vacate because the BAA has done no more than manage a temporary place of operations under the 1994 Recognition Agreement. In any event, injunctive relief is not appropriate because the BAA's claim to another building would be an adequate remedy at law should Plaintiff prevail on his claims. Furthermore, to a legal certainty, under the facts of this case, the true amount actually in controversy for Plaintiff is less than $75,000.

## PRELIMINARY STATEMENT

In this action, Plaintiff asks the Court to take the extraordinary step of (1) preventing the BAA from vacating Hughes-Dillard (which has already occurred), and (2) preventing Baylor from utilizing property it admittedly owns and which is needed for its on-campus Stadium Project.

Baylor was chartered as an institution of higher education in 1845 by the Republic of Texas, and was incorporated under the laws of the State of Texas in 1886.  Since its founding, Baylor has operated an educational institution, offering a wide range of educational services and related services and products.[2]

The BAA is an independent entity that exists as an alumni organization of Baylor and Baylor has licensed certain of the Baylor Marks to the BAA for this purpose in a 1993 License Agreement.  See Exhibit A.

In 1994, Baylor and the BAA entered into an Official Recognition and License Agreement in which Baylor granted the BAA an exclusive license to use Hughes-Dillard on the Baylor campus in Waco, Texas ("1994 Recognition Agreement").  See Exhibit B.  Under the 1994 Recognition Agreement, Baylor may terminate the BAA's right to use Hughes-Dillard in the event that Baylor needs the land on which the center is located for its purposes and no other land is reasonably available to Baylor for the purpose for which the land is needed.  Baylor is also to provide the BAA with other comparable facilities on campus.

Regarding the Stadium Project, Baylor needs the Hughes-Dillard space and building.

---

[2] Baylor has adopted and used, and licensed others to use, various trademarks and service marks, many of which include the word Baylor (the "Baylor Marks").  Through providing high quality services and products over the years, Baylor has built up enormous goodwill and reputation in the Baylor Marks, and the public widely recognizes such marks as a symbol of quality.  The Baylor Marks are valuable assets of Baylor.

Baylor's first choice for an entry point from the south side of the Brazos River to the Stadium was on the west side of the Law School.  The Waco City Manager, however, told Baylor that that location was not feasible because that area contained human remains from a graveyard that had been unearthed during construction of a new building for the Texas Ranger Hall of Fame.  The Waco City Manager also told Baylor that, in a settlement with the State, the City of Waco has designated that land as a Texas Historical Cemetery.  Baylor also considered making the entry point further east. This was not feasible because the Army Corps of Engineers regulates the shoreline of the Brazos River and to disturb the lagoon to the east of the Law School would be cost prohibitive under these regulations.  Also, a bridge further east would have to be longer which would also be cost prohibitive.  The only land reasonably available for this grand pathway is the land on which Hughes-Dillard sits.  See Exhibit I, at 5.

Populous estimates that 30,000 people will access the Stadium from the Baylor Campus on the south side of the Brazos River.  The land on which Hughes-Dillard sits will be a main entrance point for these 30,000 people as they walk from Baylor's campus, across University Parks Drive, and to the Stadium.  A sidewalk circumventing Hughes-Dillard is not feasible because it would not accommodate this large number of people making their entrance to and exit from the Stadium.  Populous has designed hundreds of stadia, and was insistent that the Stadium Project include a grand pathway large enough to accommodate the number of fans that will enter the Stadium from Baylor's campus.  See Exhibit J, Declaration of Brian Nicholson, at 4.

Further, from an aesthetic point of view, a grand pathway will visually connect the Stadium access point to the campus.  Baylor's goal for the Stadium Project is to present its fans and visitors with a complete, on-campus stadium experience.  Because the Stadium is located across the Brazos River from the current campus, a grand pathway and entry point from the

south side of the river is essential to make the Stadium a part of campus.  Eight-thousand students live on-campus or in the surrounding neighborhoods and will likely walk from the Baylor campus, across University Parks Drive, and to the Stadium.  Populous designed the grand pathway with this in mind.  In addition, the vast majority of parking for the Stadium will be on the south side of the Brazos River, and those fans will walk or be shuttled to the entry point on University Parks Drive where Hughes-Dillard currently sits.

Baylor accordingly told the BAA that Baylor needed the land on which Hughes-Dillard is located for the Stadium Project and that other property is not reasonably available to Baylor. The BAA agreed and, on May 31, 2013, Baylor and the BAA entered into an Agreement to Vacate Hughes-Dillard Alumni Center ("Agreement to Vacate").  See Exhibit C.  Under its terms, the BAA agreed to support the Stadium Project and to voluntarily vacate Hughes-Dillard and move to other space at Baylor—initially at Robinson Tower, a building on the Baylor campus.

While Plaintiff claims that the Agreement to Vacate is part of the Transition Agreement,[3] the circumstances, as well as a reading of the two agreements, shows that to be incorrect. Because of the Stadium Project, the Hughes-Dillard issue would have to be faced whether or not there was a Transition Agreement.  The Transition Agreement itself specifically notes that the Agreement to Vacate will be "resolved through a separate agreement and process."  See Exhibit D, at 6. The Agreement to Vacate *is* a separate agreement and is operative whether the members of the BAA approve (or not) the Transition Agreement.   Further, the claimed dispute over the

---

[3] In the separate Transition Agreement, the BAA agreed to transfer certain BAA activities into Baylor operations, terminate by mutual agreement executory agreements between Baylor and the BAA, create a new legal entity called the Baylor Line Corporation (BLC) for the sole purpose of publishing a magazine currently licensed as The Baylor Line, dissolve the current BAA legal entity, create a new license of certain Baylor trademarks to BLC, and transfer legal control of certain BAA employees to Baylor as Baylor employees. See Exhibit D.  The Transition Agreement is subject to the approval by the members of the BAA in a vote scheduled for September 8, 2013.

Transition Agreement is premature, since it is still subject to Board and/or Member approval in September 2013.

Plaintiff filed his Complaint and Application on July 2nd in an attempt to stop the BAA from vacating Hughes-Dillard on July 3rd.  Plaintiff has known about Baylor's plans regarding Hughes-Dillard since at least June 21, 2013, (and probably much earlier) when his counsel Gerald W. Haddock sent a letter to Baylor asking to delay the July 3, 2013 date for the BAA to vacate Hughes-Dillard.  See Exhibit H.  Yet, Plaintiff waited until *the day before the demolition date* to file its Application in an obvious attempt to disrupt Baylor's planned construction sequence.

### ARGUMENT AND AUTHORITIES

### I.    PLAINTIFF LACKS STANDING TO BRING THIS BREACH OF CONTRACT ACTION AGAINST BAYLOR

Plaintiff lacks standing in his claims against Baylor because only parties to a contract can sue for breach of that contract.  *See Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (holding that standing is required to bring suit).  Unless a plaintiff has standing, a federal district court lacks subject matter jurisdiction to address the merits of the case.  *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975).  In the absence of standing, there is no "case or controversy" between the plaintiff and defendant which serves as the basis for the exercise of judicial power under Article III of the Constitution. *Id.*   Plaintiff is an individual member of the BAA.  However, both the 1994 Recognition Agreement and the 2013 Agreement to Vacate were entered into between Baylor and the BAA. Plaintiff is not a party to either agreement.  The only party that can bring a suit for breach of contract against Baylor for either the 1994 Recognition Agreement or the 2013 Agreement to Vacate is the BAA.  Yet, Plaintiff's unsupported claim here is that Baylor has not satisfied the

terms of the 1994 Recognition Agreement in order to move the BAA to make way for the Campus access to the Stadium. *Cmplt* ¶¶ 27-31, 39-45, 54-57. That is not his claim to make. He has no right (and does not purport) to make it derivatively on behalf of the BAA. *See Flores v. Star Cab Coop. Assn.*, 2008 WL 3980762 (Tex. App. – Amarillo 2008, no pet.) (not reported).

Plaintiff is not a third-party beneficiary under Texas law. Further, Plaintiff even disclaims any preliminary injunctive relief based on that claim.[4] *See* Application at 5 n.1. A third party is a beneficiary of a contract only if (1) the contracting parties clearly intended to secure a benefit for the third party and (2) the contracting parties entered into the contract directly for the third party's benefit. *M.C.I. Telecomms. Corp. v. Tex. Util. Elec. Co.,* 995 S.W.2d 647, 652 (Tex. 1999). Under Texas law, there is a presumption against third-party beneficiary agreements. *Id.* A third party is a beneficiary of a contract only if the contract clearly and fully expresses the intent to confer a direct benefit on the third party. *Id.*; *S. Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 306 (Tex. 2007). Whether a contract expresses the intent to confer a direct benefit on the third party is a question of law. *M.C.I. Telecoms. Corp.*, 995 S.W.3d at 652; *Lomas*, 223 S.W.3d at 306. Here, there is no language in either the 1994 Recognition Agreement or the 2013 Agreement to Vacate indicating any intent to confer a ***direct*** benefit to individual BAA members. Furthermore, a third party is a beneficiary of a contract only if he received a direct benefit, not if the benefit was incidental to the contract. *M.C.I. Telecoms. Corp.*, 995 S.W.3d at 652; *Lomas*, 223 S.W.3d at 306. The BAA does not even list access to Hughes-Dillard as one of its benefits of membership on its website. See Exhibit E.

---

[4] Plaintiff's TRO is only based on claims against the BAA, Coker and Cox; it is not based on any claim cognizable against Baylor. See Application, at 5 n.1. However, Plaintiff seeks to enjoin Baylor from demolishing a building and utilizing property that it unquestionably owns.

Plaintiff is not a third-party beneficiary and has no standing to sue on that basis.

## II.     PLAINTIFF'S CLAIMS ARE MOOT BECAUSE THE BAA HAS ALREADY RELOCATED

Plaintiff seeks injunctive relief to keep the BAA from moving out of Hughes-Dillard; however, the BAA moved out of Hughes-Dillard and into Robinson Tower on June 28, 2013. Plaintiff did not file his Application until July 2, 2013.  A "request for injunctive relief generally becomes moot upon the happening of the event sought to be enjoined." *JSLG, Inc. v. City of Waco*, 504 Fed. Appx. 312, 315 (5th Cir. 2012) (quoting *Harris v. City of Houston*, 151 F.3d 186, 189 (5th Cir. 1998)).  "[O]nce the action that the plaintiff sought to have enjoined has occurred, the case is mooted because no order of this court could affect the parties' rights with respect to the injunction [the court is] called upon to review." *Id.*

Plaintiff has known about Baylor's plans regarding Hughes-Dillard since at least June 21, 2013, when his counsel Gerald W. Haddock sent a letter to Baylor asking Baylor to delay the July 3, 2013 date for the BAA to vacate Hughes-Dillard.  See Exhibit H.  Plaintiff likely knew about the plans even earlier, as Haddock's letter makes reference to President Starr's message to the Baylor Nation on June 10.  However, Plaintiff waited until July 2, 2013, ***the day before the demolition date***, to file his Application in an attempt to impact the planned construction.  But by the time Plaintiff filed his Application, the BAA had already moved out of Hughes-Dillard so that Baylor could begin construction on July 3.  Plaintiff's request for an injunction, therefore is moot, and he has forfeited his right to any claim because of his unreasonable delay in bringing his suit.  *See Clark v. Volpe*, 342 F. Supp. 1324, 1327-28 (E.D. La. 1972), decision aff'd, 461 F.2d 1266 (5th Cir. 1972) (holding that plaintiffs' claim for injunctive relief was barred by the doctrine of laches because plaintiffs knew of planned construction but delayed unreasonably in bringing their suit).

## III.   THIS COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER THIS CASE BECAUSE THE AMOUNT IN CONTROVERSY DOES NOT EXCEED $75,000 IN VALUE

Plaintiff summarily claims that the amount in controversy exceeds $75,000 because the value of the "property at stake in this case" exceeds $75,000.  Yet, it is not *his* property, and he has no right or ownership interest in it, as a matter of law—nor does he even claim one. "The amount in controversy, in an action for declaratory or injunctive relief, is the value of the right to be protected or the extent of the injury to be prevented."  *St. Paul Reinsurance Co., Ltd. v. Greenberg*, 134 F.3d 1250, 1252-53 (5th Cir. 1998); *Leininger v. Leininger*, 705 F.2d 727, 729 (5th Cir. 1983).   In cases where the plaintiff actually owns an interest in property which is the subject of the injunction—such as a foreclosure case—the property value can serve as the appropriate jurisdictional amount.  *Dillard Family Trust v. Chase Home Fin., LLC*, 3:11-CV-1740-L, 2011 WL 6747416 (N.D. Tex. Dec. 23, 2011) ("If the court…quiets title to the property, Dillard will hold indefeasible title to the entire property.  Thus, Dillard's request…calls into question a right to the property in its entirety, and the amount in controversy is equal to the value of the property.").   However, the entire property right of Hughes-Dillard is not called into question in this case.  Baylor undisputedly owns Hughes-Dillard and the BAA had a permissive use license in Hughes-Dillard.  Plaintiff, however, has no property rights in Hughes-Dillard, or in any property of the BAA.  The "right" that Plaintiff is seeking to protect amounts only to that which is pleaded as his claimed irreparable harm—the right to visit Hughes-Dillard when he travels to Waco from Illinois.

It stretches reason to claim that his right of use of Hughes-Dillard (as opposed to another campus building) is worth $7,500—much less $75,000.  Yet, Plaintiff makes clear throughout his various pleadings that **his** loss (the only claimed irreparable loss as to Hughes-Dillard) will be his inability to visit Hughes-Dillard when he visits the Baylor campus from his home state of

Illinois.  Yet he provides no evidence that he has visited Waco (or Hughes-Dillard) on any regular basis from Illinois, nor does he specify why another BAA location will not suffice.

The BAA's website does not list Hughes-Dillard as one of the 17 benefits or services of the members of the BAA.  See Exhibit E.  Members (as a matter of law) have no ownership or possessory interest in Hughes-Dillard.  The BAA's website does not even mention visiting Hughes-Dillard as a benefit of membership.  A current life membership to the BAA costs $1,000.  See Exhibit F.  On information and belief, it used to be less—$500.  Plaintiff claims his interest as a "voting Lifetime Member of the BAA" – therefore, his maximum economic interest in BAA is $1,000.  Plaintiff has thus not satisfied the requirements of 28 U.S.C. § 1332(a).  It is apparent that Plaintiff cannot recover or support the jurisdictional amount pleaded, thus this case should be dismissed.  *St. Paul Mercury Indem. Co. v. Red Cab Co*., 303 U.S. 283 (1938).

## IV.   PLAINTIFF HAS FAILED TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

In his Complaint, Plaintiff has not and cannot plead facts sufficient to state a claim upon which relief can be granted against Baylor.  The purpose of a motion to dismiss for failure to state a claim is to test the sufficiency of the complaint under Federal Rule of Civil Procedure 8.  See *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-60 (2007).

"A pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 677-78. The Rule 8 pleading standard "does not require 'detailed factual allegations,' but it demands more than unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

To satisfy the standard, "the complaint must provide more than conclusions, but it "need not contain detailed factual allegations." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011)

-11-

(citing *Colony Ins. Co. v. Peachtree Constr., Ltd*., 647 F.3d 248, 252 (5th Cir. 2011)). However, the complaint "must allege enough facts to move the claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). When reviewing a motion to dismiss, a complaint will survive "if its facts, accepted as true, 'state a claim to relief that is plausible on its face.'" *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012) (quoting *Twombly*, 550 U.S. at 570). A plaintiff does not meet this standard with "'naked assertion[s]' devoid of 'further factual enhancements.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Therefore, the central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief. *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 440 n.8 (5th Cir. 2000). A plaintiff's claims should be dismissed if this pleading standard is not met. FED. R. CIV. P. 12(b)(6).

Plaintiff's Complaint does not contain sufficient allegations to support the elements of his claims, particularly as a stranger to these agreements suing on an individual basis. Rather, the Complaint merely asserts bare legal conclusions and states that those conclusions entitle Plaintiff to the relief he requests. As discussed more fully in Section V herein, Plaintiff has failed to state a claim upon which relief can be granted because the facts as pleaded make clear that (1) Baylor and the BAA have entered into an agreement in which the BAA agreed to vacate Hughes-Dillard by July 3; (2) the 1994 Recognition Agreement provides a mechanism for Baylor to utilize that site for its needs, and relocate the BAA to comparable space and Baylor has properly followed that procedure; and (3) Plaintiff cannot properly claim third-party beneficiary status under the BAA agreements.

## V.   PLAINTIFF IS NOT ENTITLED TO INJUNCTIVE RELIEF

Injunctive relief "is an *extraordinary* and *drastic* remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Canal Auth. v. Callaway*, 489 F.2d

567, 573 (5th Cir. 1974) (emphasis added);  *see also Alliance Royalties, LLC v. Boothe*, 313 S.W.3d 493, 496 (Tex. App.—Dallas 2010).   The extraordinary equitable remedy of an injunction must be carefully regulated and confined to proper cases. *See Canal Auth.* 489 F.2d at 573; *Associated Gen. Contractors of Tex., Inc. v. City of El Paso,* 932 S.W.2d 124, 126 (Tex. App.— El Paso 1996, no pet.); *Raine v. Searles,* 302 S.W.2d 486, 487 (Tex.Civ.App.—El Paso 1957, no writ); *Camp v. Shannon,* 348 S.W.2d 517, 519 (Tex. 1961).

The granting of injunctive relief should not be considered lightly and should only be granted in rare circumstances.  *See, e.g., Canal Auth.* 489 F.2d at 573; *Law v. William Marsh Rice Univ.*, 123 S.W.3d 786, 792 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("The trial court should grant temporary injunctive relief only if the applicant demonstrates a probable right to permanent relief upon a trial on the merits and a probable injury during the pendency of the trial unless the injunction issues."); *Allied Capital Partners, LP v. Proceed Technical Res., Inc.*, 313 S.W.3d 460 (Tex. App.—Dallas 2010) ("A temporary injunction should be extraordinary, not routine.").

For a preliminary injunction to be issued, a party must plead and prove: (1) a probable right to the relief sought, (2) a probable, imminent and irreparable injury in the interim, (3) that there is no adequate remedy at law, (4) the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (5) that granting the preliminary injunction will not disserve the public interest or nonparties.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Canal Auth.* 489 F.2d at 572.  Plaintiff cannot meet his burdens of establishing any of these elements.

      A.     **<u>Plaintiff Demonstrates Virtually No Likelihood of Prevailing on the Merits of the Case, Thus the Request for Injunctive Relief Should be Denied</u>**

To obtain injunctive relief, an applicant must establish that he has a probable right to relief on the merits of his claims at trial. *Winter* 555 U.S. at 20; *Davis v. Huey¸* 571 S.W.2d 859 (Tex. 1978). In order for Plaintiff to prevail in this action he must prove that he has a right to assert the BAA's breach of contract claim as to its right to occupy Hughes-Dillard, *and* that the BAA would prevail. *See id.* Yet he has no standing or right to make such a claim. Plaintiff alleges that Baylor has breached the 1994 Recognition Agreement by forcing the BAA to vacate Hughes-Dillard. Yet this ignores the 1994 Recognition Agreement and the accommodation reached in the 2013 Agreement to Vacate. Plaintiff cannot establish a probable right to relief on his claims because (1) the BAA voluntarily agreed to support the Stadium Project and vacate Hughes-Dillard by July 3; and (2) the 1994 Recognition Agreement provides a mechanism for Baylor to move the BAA to comparable space, and then utilize Hughes-Dillard for its purposes—Baylor has properly followed that procedure and is justified in its request. Moreover, given the circumstances, the need for the Hughes-Dillard site would exist independent of the Transition Agreement, and indeed they are separate and not co-dependent agreements. Because Plaintiff cannot establish a probable right to the relief on his claim at trial with respect to restricting the use of Hughes-Dillard, his request for injunctive relief must be denied and the case should be dismissed.

1.     **The 2013 Agreement to Vacate is a legally enforceable agreement in which the BAA agreed to vacate the Hughes-Dillard Alumni Center by July 3 under the 1994 Recognition Agreement.**

Under Texas law, if the parties to a prior agreement enter into a subsequent contract that covers the same subject, but the second agreement contains terms that are inconsistent with those of the prior agreement, the later document generally supersedes the earlier agreement, at least to those terms. *See Willeke v. Bailey*, 189 S.W.2d 477, 479 (Tex. 1945). In this case, the two agreements both cover the same subject - the use of Hughes-Dillard. The second agreement

modifies the first, in that the BAA agrees to support the Stadium Project and vacate Hughes-Dillard.

Plaintiff claims, incorrectly, that the 2013 Agreement to Vacate is not legally enforceable because the executive committee of the BAA did not have authority to bind the BAA to that agreement.  The executive committee of the BAA had actual authority to bind the BAA under its bylaws, and in the alternative, had apparent authority to bind the BAA.[5]

> a.  *Under the Bylaws of the BAA, the Executive Committee has actual authority to bind the organization.*

Plaintiff argues that the 2013 Agreement to Vacate is not legally binding because the Executive Committee did not have authority to bind the BAA, and therefore, the 1994 Recognition Agreement is still in effect.  This statement is incorrect;  the Executive Committee did have actual authority to enter into the 2013 Agreement to Vacate.  Actual authority exists when the organization expressly confers authority.  *See  Lozada v. Farrall & Blackwell Agency, Inc.*, 323 S.W.3d 278, 292 (Tex. App.—El Paso 2010).

The Constitution and Bylaws of the Baylor Alumni Association (the "Bylaws) expressly state that the Executive Committee of the BAA "shall have and exercise the authority of the Board of Directors in the management of the Association at all times except when the Board of Directors or the membership may be meeting."  *See* Art. VI to Bylaws attached as Exhibit G.  Thus the Executive Committee could take all such actions as could be taken by the full Board of Directors.  In his sworn pleading, Plaintiff failed to even reference this section of the Bylaws when he set out his claimed facts and asked the Court for injunctive relief.

---

[5] The President, President-Elect, Executive Vice president and CEO, and Senior Vice President for Operations and Chief Financial Officer were given permission to act for the rest of the Executive Committee in signing the 2013 Agreement to Vacate.

The decision by the Executive Committee of the BAA to support the Stadium Project to vacate Hughes-Dillard and relocate the BAA to a new building was thus properly made.  The decision is consistent with Baylor's express right under the 1994 Recognition Agreement (and otherwise).[6]  Baylor and the BAA were represented by counsel at the time.  Neither the Board of Directors or the membership met around this time period.  Therefore, the Executive Committee had the actual (and apparent) authority to bind the BAA.  The 2013 Agreement to Vacate is valid.[7]  Plaintiff cites no authority for (or facts to support) a claim that this decision—the move to other space—requires the BAA member approval, and in fact it does not.

> b.  *In the alternative, the Executive Committee had apparent authority to bind the BAA.*

The Executive Committee also had apparent authority such that the BAA is bound to the 2013 Agreement to Vacate.  Apparent authority exists when the principal's words or conduct are represented to a third-party in which the agent is clothed with authority.  Apparent authority is established here by showing that the BAA either: (a) knowingly permitted the Executive Committee to hold itself out as having the authority; or (b) showed a lack of ordinary care that clothed the Executive Committee with the indicia of authority. *NationsBank, N.A. v. Dilling*, 922

---

[6] The Bylaws state that the Executive Committee shall have the authority in the management of the BAA at all times except, *inter alia*, "in reference to … authorizing the sale, lease, exchange, or mortgage of all or substantially all of the property and assets of the Association."  The 2013 Agreement to Vacate does not involve "all or substantially all" of the BAA's property. In part, because the BAA does not own Hughes-Dillard.  Baylor owns the building and the BAA was already subject to Baylor's right to move the BAA to comparable space.  The BAA simply had a license—a permission—to use the building.  In the Agreement to Vacate, the BAA recognizes Baylor's preexisting rights to move it to other space, and does so in support of the Stadium Project.  The BAA is not surrendering its substantial bank or investment accounts or other property in the Agreement to Vacate, and the agreement does not depend upon approval, or not, of the Transition Agreement.

[7] Plaintiff also argues that Baylor has indicated that if the members of the BAA do not approve the Transition Agreement then Baylor will terminate all of its agreements with the BAA.  Baylor's decision to unilaterally terminate its agreements with the BAA in the event the Transition Agreement is not approved is an independent action by Baylor that may or may not come to pass and does not determine the authority the BAA Executive Committee has under the Bylaws.  It has not come to fruition and is not yet a ripe controversy.

S.W.2d 950 (Tex. 1996); *McWhorter v. Sheller*, 993 S.W.2d 781 (Tex. App.—Houston [14th Dist.] 1999).

It is clear from the Bylaws that the Executive Committee has the right to manage the organization.  By enacting Bylaws giving the Executive Committee the right to manage the BAA, the BAA (and its members) clothed the Executive Committee with apparent authority to act on its behalf in all circumstances except those specifically prohibited by the Bylaws.  Finally, by signing the agreement, the Executive Committee (who speaks for the BAA) knowingly gave the impression that they had authority to sign the agreement for the BAA.[8]

The President, President-Elect, Executive Vice Present and CEO all signed the agreement, and that alone is evidence that they had apparent authority. *See Fed. Deposit Ins. Corp. v. Texas Bank of Garland*, 783 S.W.2d 604, 607 (Tex. App.—Dallas 1989); *see also Rourke v. Garza*, 530 S.W.2d 794, 803 (Tex. 1975) *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007).  Entering into agreements regarding office space and leases are typical transactions that a President and the Executive Committee of an organization typically enter into without the necessity of Board or Membership vote. Therefore, the Executive Committee had apparent authority to bind the BAA to the 2013 Agreement to Vacate.  The Court should deny Plaintiff's request for injunction with respect to the Hughes-Dillard.

2. **The 1994 Recognition Agreement provides a mechanism for the BAA to vacate the Hughes-Dillard Alumni Center.**

---

[8] A party seeking to charge a principal through the apparent authority of its agent must establish conduct by the principal which would lead a reasonably prudent person to believe the agent has the authority it purports to exercise. *McWhorter v. Sheller*, 993 S.W.2d 781 (Tex. App.—Houston [14th Dist.] 1999).  The Executive Committee itself (represented by Counsel) believed that the Bylaws granted them authority to enter into the Agreement to Vacate, so it is reasonable for Baylor to assume the same.

The 1994 Recognition Agreement also provides a mechanism by which Baylor may terminate the BAA's right to use Hughes-Dillard in the event that Baylor needs the Hughes-Dillard site for its purposes and no other land is reasonably available to Baylor for that purpose. It also contains an obligation to provide the BAA with comparable space on Baylor's campus. Baylor determined that it needs the land on which Hughes-Dillard is located for the campus access to the Stadium and that other land is not reasonably available to Baylor. Baylor agreed to provide interim space for the BAA in the Robinson Tower on campus. Robinson Tower was chosen because Baylor's "Vice President for Constituent Engagement" is located in Robinson Tower. *See* 2013 Agreement to Vacate at § 2(b). The BAA agreed that Robinson Tower was a suitable temporary replacement for Hughes-Dillard. *See* Agreement to Vacate. All BAA staff and furniture, fixtures and equipment have *already* been relocated to Robinson Tower.

Plaintiff cannot show a probable right to relief in his claim that Baylor breached the 1994 Recognition Agreement because Baylor followed the proper procedure as outlined in that agreement.

### B.   <u>Plaintiff Will Not Sustain an Imminent and Irreparable Injury as a Result of the BAA vacating the Hughes-Dillard Alumni Center</u>

In addition to showing a substantial likelihood of success on the merits, Plaintiff must also establish that he will suffer imminent and irreparable injury if its request for injunctive relief is not granted. *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 236 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Irreparable harm occurs where an injury is of such a nature that the injured party cannot be adequately compensated with money damages or another remedy at law. *Id.* Accordingly, Plaintiff must show that he cannot be compensated by a less drastic remedy than injunctive relief. *Id.* There must be more than a showing of harm or injury that is "merely possible or feared," as injury that is simply conjectural is insufficient. *Friona*

*Indep. Sch. Dist. v. King*, 15 S.W.3d 653, 659-60 (Tex. App.—Amarillo 2000, no pet.); *see also Frey v. DeCordova Bend Estates Owners Ass'n*, 647 S.W.2d 246, 248 (Tex. 1983) ("[F]ear or apprehension of the possibility of injury alone is not a basis for injunctive relief.").

Plaintiff alleges that injunctive relief is necessary because he will suffer an irreparable injury if the BAA is forced to vacate Hughes-Dillard. This is simply false. He lives in Illinois. He has provided no basis for a claim or any finding that he has any enforceable interest in any property of the BAA, much less Hughes-Dillard, which is admittedly owned by Baylor. The BAA can be compensated with another remedy at law, namely the use of another building on the Baylor campus, to which it has already agreed, and, on an interim basis, to which it has already moved its offices, equipment and staff. The 1994 Recognition Agreement itself contemplates that Hughes-Dillard is not irreplaceable since it recognizes Baylor's right to move the BAA to other comparable space. Hughes-Dillard is not so unique that the BAA cannot be adequately compensated with the right to use another building on the Baylor campus, nor has Plaintiff shown—or even claimed—that other comparable space will not suffice for his needs if and when he comes to Waco from Illinois, or that he suffers any compensable damage if it does not. Plaintiff, therefore, has not shown (and cannot show) that he will suffer irreparable harm.

**C.     Plaintiff has failed to demonstrate that the alleged harm to him outweighs the potential harm Baylor will suffer if the injunction is granted**

In order for Plaintiff to meet the prerequisites for the granting of an injunction he must show that the threatened injury to him outweighs the threatened harm that the injunction may have on Defendants. *See Canal Auth.*, 489 F.2d at 572. Plaintiff cannot meet this requirement.

Plaintiff's alleged threatened harm is that he will not be able to use and enjoy Hughes-Dillard when he is in town from Illinois. Yet, Plaintiff has no enforceable right to use Hughes-Dillard. The building is owned by Baylor and used by the BAA. The BAA members do not

have an express individual right to the use of the building through their membership.  Plaintiff does not allege, because he cannot, that he will suffer the loss of the value of the building itself. The BAA will still have a building on Baylor campus that Plaintiff can visit, if he chooses to do so.

On the other hand, Defendants' potential harm is quite severe.  Baylor is entitled to the right to use its own land in support of the $250 million Stadium Project in order to provide the campus access called for the by the project architect.  Hughes-Dillard sits in the middle of what will be the grand pathway that will connect the campus to the Stadium.  While Plaintiff blithely claims (from Illinois) that other property is available to Baylor for that purpose, he specifies nothing in support of that conclusion.  Baylor—particularly for a project of this size and substance—is certainly entitled to proceed in the manner recommended by the project architect as best suited for the Stadium and its campus access for the tens of thousands of students and fans that will utilize it.

Additionally, delaying  the construction schedule—or forcing the redesign of the Campus access—will certainly burden Baylor, particularly as it strives to have the entire project ready for the 2014 football season.  Any delay in the demolition of Hughes-Dillard will create construction sequencing problems for the overall Stadium Project.  As part of the Stadium Project, 93 acres will be developed on the south side of the Brazos River to provide access to the approximately 30,000 fans who will access the Stadium from Baylor's campus. Baylor's Construction Manager has already contracted with subcontractors to develop this area and any delay could result in additional costs to secure the subcontractors during the delay.  The demolition of Hughes-Dillard is one of the first steps in the construction schedule because it sits at the main entrance to this 35'-wide pedestrian bridge that spans the Brazos.  Hughes-Dillard must be removed so that a

500-ton crane can be positioned on the south bank of the Brazos River to construct the access bridge, and the only pathway to move the crane into position is over the land occupied by Hughes-Dillard.  Se Exhibit J, at 5.

If the Court prohibits the demolition of Hughes-Dillard, the additional costs to Baylor will be enormous.  Baylor's architects would literally have to go back to the drawing board and conceive and design a new plan for entry to the Stadium from the south side of the Brazos River. These delays could also prohibit the completion of the Stadium Project in time for the 2014 Baylor Football Season, which will have great costs to Baylor and Waco.  See Exhibit J, at 6. By way of example, if Baylor were to miss the first four games of the 2014 Football Season in the new Stadium, it could lose over $7 Million in suite revenue alone.  In addition, Baylor could also lose money for its loge seats, club seats, game day revenues, and additional costs to prepare Floyd Casey Stadium for the 2014 Football Season.  See Exhibit I at 6.

Further, the current construction schedule has been made to accommodate the Mayborn Museum Complex, which is next to Hughes-Dillard.  The Mayborn Museum Complex is comprised of a Natural History Museum, a Historic Village, and a Children's Discovery Center. The land on which Hughes-Dillard sits will be used as a temporary parking lot for the museum while the museum's parking lot is used as a construction staging area for the 93 acres.  Baylor must complete the development of the 93 acres South of the Brazos River related to the Stadium Project prior to the museum's peak season, which is February through the summer months.  In addition, the current construction schedule takes into account the Law School's academic calendar and a delay will negatively impact those plans as well.  See Exhibit J, at 7.

Plaintiff cannot establish that his threatened harm from denying the injunction outweighs the potential harm to Defendants that would come from granting the injunction, particularly since the BAA offices and staff have already relocated. Therefore, the injunction should be denied.

### D.       An Injunction Will Harm the Public Interest and Nonparties

This Court should not issue a preliminary injunction in this case because doing so would harm the public interest and nonparties. *See Winter v. Nat. Res. Defense Council, Inc*., 129 S. Ct. 365, 378 (2008); *Sammartano v. First Judicial Dist. Ct*., 303 F.3d 959, 974 (9th Cir. 2002) ("The public interest inquiry primarily addresses impact on non-parties rather than parties); *CSX Transp. V. Tennessee State Bd. of Equalization*, 964 F.2d 548, 551 (6th Cir. 1992) (stating that a court may consider "whether the injunction will have a harmful effect on third parties" in addition to whether an injunction will impact the public interest). In exercising their sound discretion, courts "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* Where an injunction's reach is narrow and affects only the parties with no impact on nonparties, "the public interest will be at most a neutral factor in the analysis rather than one that favors granting or denying the preliminary injunction." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) (internal quotes and brackets omitted). If the injunction goes beyond the parties, carrying with it a potential for public consequences, the public interest becomes relevant to whether an injunction should issue: "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *United States v. First Nat'l City Bank*, 379 U.S. 378, 383 (1965).

Plaintiff has failed to show that the public interest will not be harmed. The injunction he seeks will affect, and perhaps deny one of the primary benefits the Stadium offers—a direct, visible, and impressive tie-in to the Baylor campus through the grand pathway. Moreover,

donors have given well over 50% of the total cost of the Stadium Project in anticipation of a complete on-campus Stadium experience.  Likewise, the City of Waco has graciously invested $35 million in the Stadium Project.  Waco obviously views the Stadium Project as a potential economic boom to the City.  In addition, Baylor has seen a significant increase in giving to scholarships and academic programs since the announcement of the Stadium Project.  See Exhibit I, at 4.  An injunction would affect those donors who have given so generously, the Baylor students, student-athletes, faculty and other fans, visitors to campus for games and otherwise, as well as adjacent facilities for parking, vendors and other services.  For Plaintiff, the countervailing injury claims—that he would not be able to visit Hughes-Dillard when he visits Baylor from Illinois is self-centered.  Accordingly, Plaintiff should not be allowed to interfere with Baylor's $250 million Stadium Project in this manner.

## CONCLUSION

Accordingly, Defendant respectfully requests that the Court dissolve the Temporary Restraining Order, deny Plaintiff's request for injunctive relief and dismiss Plaintiff's Complaint in its entirety.  Defendant further requests such other relief to which it shown itself to be justly entitled.

Respectfully submitted,

FULBRIGHT WINNIFORD

By:____/s/ Angus E. "Andy" McSwain_____
     Angus E. "Andy" McSwain
     Texas Bar No. 13861100
     amcswain@fulbrightlaw.com
     P.O. Box 445
     Waco, TX 76703-0445
     Tel: 254-776-6000
     Fax: 254-776-8555

BRACEWELL & GIULIANI LLP

By:_____/s/ Tony L. Visage_____
     Tony L. Visage
     Texas Bar No. 00788587
     tony.visage@bgllp.com
     J. Erick Sandlin
     Texas Bar No. 24056265
     erick.sandlin@bgllp.com
     Jessica E. Hart
     Texas Bar No. 24067647
     jessica.hart@bgllp.com
     711 Louisiana St., Suite 2300
     Houston, Texas 77002
     Tel: 713-221-1326
     Fax: 713-437-5372

     COUNSEL FOR BAYLOR UNIVERSITY

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was duly served on all known counsel of record by means of certified mail, return receipt requested and/or electronic mail on July 9, 2013.

_____/s/ Angus E. "Andy" McSwain_____
Angus E. "Andy" McSwain